UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

|  | Chapter 11 |
|---|---|
|  | Case Nos.: 16-74892 (AST) |
| OLYMPIA OFFICE LLC, *et. al.*, | 16-75515 (AST) |
|  | 16-75516 (AST) |
| Debtors. | 16-75517 (AST) |
|  | (Jointly Administered) |

-------------------------------------------------------------x

## DECISION AND ORDER AUTHORIZING DEBTORS' RETENTION OF COUNSEL

### *Issue presented and summary of ruling*

In this contentious series of real estate cases, the secured lender has objected to Debtors'
retention of counsel.  While the pleadings concerning retention have meandered into substantive
issues affecting the cases overall, the narrow question presented is whether Debtors' proposed
counsel is not disinterested for purposes of the Bankruptcy Code[1] because a partner at that law
firm is first cousins with the majority owners of the equity in these Debtors.  Because New York
law does not render first cousins as within the third degree of consanguinity, and because no
adverse interest has been demonstrated, Debtors will be allowed to retain the counsel they have
chosen.

### *Background*

In or about 2004, an entity known as CDC Properties I, LLC ("CDC") entered into two
loan agreements (the "Loans") with Merrill Lynch Mortgage Lending, Inc. (the "Original
Lender"), and secured those Loans with liens against eleven properties located in the State of
Washington (the "Original Collateral") pursuant to duly recorded deeds of trust (the "Deeds of
Trust").  On or about September 30, 2005, the Original Lender assigned the Loans to Wells Fargo

---

[1] 11 U.S.C. §§ 101 *et seq.*

Bank N.A., as Trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2005-MCP1

Commercial Mortgage Pass-Through Certificates, Series 2005-MCP1 ("Wells Fargo") and U.S.

Bank, N.A., as Successor-Trustee to LaSalle Bank N.A., as Trustee for the benefit of the Certificate

Holders of Commercial Mortgage Pass-Through Certificates, Series MCCMT 2004-C2D ("U.S.

Bank" and together with Wells Fargo, "Lenders").

CDC defaulted under the Loans, and on February 10, 2011, filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code in the Western District of Washington (the "CDC

Bankruptcy Court"), and assigned Case No. 11-41010 (the "CDC Bankruptcy Case"). On

November 22, 2011, the CDC Bankruptcy Court confirmed CDC's Plan of Reorganization (the

"CDC Plan"), under which, *inter alia*, the Loans and Deeds of Trust remained in effect pursuant

to their terms but with new monthly payment amounts and a new maturity date of October 17,

2017. The CDC Bankruptcy Case was closed on or about February 15, 2012.

CDC defaulted under its Plan obligations. On March 11, 2016, Lenders commenced non-

judicial foreclosure proceedings against the nine commercial properties that remained from the

Original Collateral (the "Properties"). In May 2016, Lenders filed a Petition to Appoint Custodial

Receiver in Washington state court to, among other things, obtain the appointment of a receiver

over the Properties. On May 19, 2016, the state court entered its Order Appointing Custodial

Receiver, pursuant to which JSH Properties, Inc. was appointed receiver over the Properties.

On or about July 1, 2016, Lenders served and subsequently recorded Notices of Trustee's

Sales with respect to the Properties (the "Notices of Sale"), pursuant to which non-judicial

foreclosure sales of the Properties were scheduled for October 21, 2016.

On or about September 23, 2016, CDC, without Lenders' consent, transferred all of the

Properties by Quitclaim Deeds (the "Transfers") to four different, newly created entities located

in four different states other than Washington (New York, Florida, Virginia, and Delaware), as tenants in common.  These four entities are: Olympia Office LLC ("Olympia"); Seahawk Portfolio LLC; Mariners Portfolio LLC; and WA Portfolio LLC (collectively, the "Acquirers").  While each Acquirer, alone, received fractional interests in the Properties, collectively, they obtained 100% ownership of the Properties.  At the time of the Transfers, the outstanding balance owed on the Loans exceeded $33 million.

On or about October 18, 2016, MLMT 2005-MCP1 Washington Office Properties, LLC succeeded to Lenders' rights under the Loans and the Deeds of Trust ("Noteholder").

On October 20, 2016, Olympia filed a voluntary petition under chapter 11 before the United States Bankruptcy Court for the Eastern District of New York (the "Court").  The petition was signed by the Long Island, New York law firm of LaMonica Herbst & Maniscalco, LLP as counsel ("LHM").

On November 16, 2016, Olympia filed an application seeking authority to retain LHM as its attorney (the "Employment Application").[2]  [dkt item 17]  Included with the Employment Application was an affidavit of Jordan Pilevsky, a partner at LHM, in which he testified:

> As noted in the Debtor's statement of financial affairs, a cousin of mine is an equity member of an entity that owns the Debtor. Based upon the foregoing, LH&M does not believe that it is conflicted from representing the Debtor as its general counsel.

On November 21, 2016, the Court held a temporary restraining order hearing (the "TRO Hearing") in an adversary proceeding filed by Olympia (adv. 16-08167-ast), which concerned post-petition actions taken by Noteholder to reopen the CDC Bankruptcy Case and, in effect, invalidate the Transfers to the Acquirers.  Given the level of activity in this case as of the TRO Hearing, the

---

[2] Various skirmishes occurred between the filing of the Olympia case and the time Olympia filed the Employment Application, which do not bear upon the retention issues.

Court raised the issue of Debtor's pending retention request.  The representative of the Office of the United States Trustee (the "UST") stated that he had reviewed the Employment Application and had no objection; however, Noteholder stated it wished to further review the application and obtain additional information.

On November 23, 2016, Noteholder filed a limited objection to the Employment Application. [dkt item 22]

While the Employment Application and other issues were pending, on November 28, 2016, the remaining Acquirers (Seahawk Portfolio, Mariners Portfolio, and WA Portfolio) each filed chapter 11 cases with this Court (collectively with Olympia, "Debtors").  These four related cases have been administratively consolidated, and all Debtors have filed applications seeking to retain LHM as counsel.

On December 1, 2016, LHM filed a Response to Noteholder's limited objection.  [dkt item 35]

On December 7, 2016, the Court held a hearing on, *inter alia*, the Employment Application, at which the UST stated that perhaps further disclosures were appropriate.  Thus, the Court set a protocol for further disclosures to be filed by LHM by December 14, 2016, and any supplemental objections to be filed by December 21, 2016.

On December 14, 2016, Jordan Pilevsky filed a Supplemental Declaration in support of the Employment Application, which disclosed his familial relationship to two equity owners.  [dkt item 60]

On December 20, 2016, Noteholder filed a Supplemental Objection to the Employment Application ("Supplemental Objection").  [dkt item 72]

The Employment Application and the disclosures made in connection therewith

demonstrate that, whether directly or indirectly, the individual equity holders of Debtors consist of Scott Switzer, Conrad Switzer, Kazu Yamaguchi, Michael Pilevsky and Seth Pilevsky.  Michael and Seth Pilevsky are brothers and collectively control, directly or indirectly, 90% of the equity ownership in each of Debtors (the "Investors Pilevsky"), and are first cousins to LHM partner Jordan Pilevsky ("Lawyer Pilevsky").

*Analysis*

Bankruptcy Code § 327(a) requires that a debtor seeking to retain an attorney must satisfy a two-prong test: (i) the attorney must not hold or represent an interest adverse to the bankruptcy estate; and (ii) the attorney must be a disinterested person.  In re Angelika Films 57th, Inc., 227 B.R. 29, 37 (Bankr. S.D.N.Y. 1998), aff'd, 246 B.R. 176 (S.D.N.Y. 2000).  A professional person is disinterested if he, *inter alia*, "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C).   Courts determine whether an adverse interest exists on a case-by-case basis, examining the specific facts in a case.  Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610, 623 (2d Cir. 1999); In re Project Orange Assoc., LLC, 431 B.R. 363, 370 (Bankr. S.D.N.Y. 2010); Angelika Films 57th, 227 B.R. at 39.

Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requires that an application for employment of an attorney "be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest. . . ." FED. R. BANKR. P. 2014(a).  Rule 2014-1(b) of the Local Bankruptcy Rules for the Eastern District of New York (the "Local Rules") requires that in addition to the requirements set forth in Bankruptcy Rule 2014(a), the application for employment of an attorney

shall include "a verified statement of the person to be employed stating that such person does not hold or represent an interest adverse to the estate except as specifically disclosed therein, and where employment is sought pursuant to Bankruptcy Code § 327(a), that the professional is disinterested."

Noteholder asserts two objections: (1) that LHM is not disinterested as defined under the Bankruptcy Code and Bankruptcy Rules because Lawyer Pilevsky is a relative of Investors Pilevsky; and (2) LHM is not disinterested because it holds or represents an adverse interest due to Lawyer Pilevsky's familial relationship with Investors Pilevsky. Each of these objections is overruled.

### Disinterestedness

The sole issue on disinterestedness turns on the familial relationship of Lawyer Pilevsky to Investors Pilevsky. Relevant here, Bankruptcy Code § 101(14)(A) defines the term "disinterested person" as a person that "is not a creditor, an equity security holder, or an insider." Bankruptcy Code § 101(31)(B)(vi) defines the term "insider" of a corporation to include a "relative of a general partner, director, officer, or person in control of the debtor." Bankruptcy Code § 101(45) defines the term "relative" to mean "an individual related by affinity or consanguinity within the third degree as determined by common law[] . . . ."

Although the Bankruptcy Code defines the term "relative", it does not define the term "common law" as it is used in § 101(45) or in any other section of the Bankruptcy Code. See Gold v. Rubin (In re Harvey Goldman & Co.), 2011 Bankr. LEXIS 3149, at *26 (Bankr. E.D. Mich. Aug., 24, 2011). The meaning of this phrase is important here because Noteholder argues that under the common law Lawyer Pilevsky is within three degrees of consanguinity to Investors Pilevsky, and is therefore Investors Pilevsky's relative and therefore an insider and therefore not disinterested

and therefore may not be retained.  On the other hand, LHM argues that under common law, Lawyer Pilevsky is within four degrees of consanguinity to Investors Pilevsky and therefore is not their relative.  Thus, to resolve the parties' dispute, the Court must first consider what the phrase "common law" means under Bankruptcy Code § 101(45).

Noteholder essentially asserts that "common law" means the canon law method of determining degrees of consanguinity, that is, the codification of church theology into canonical or legal language.  Marianne Perciaccante, The Courts and Canon Law, 6 Cornell J.L. & Pub. Pol'y 171 (1996) (citations omitted).  Although Noteholder's initial objection did not cite to any authority to support this assertion, in their Supplemental Objection, they ultimately rely solely on In re Gray, 355 B.R. 777 (Bankr. W.D. Mo. 2006).  In response, LHM relies on In re Harvey Goldman & Co., for the proposition that the operative "common law" is the law of the state in which the debtor's bankruptcy case was filed.  2011 Bankr. LEXIS 3149, at *26.

There are relatively few bankruptcy court opinions that address the meaning of the phrase "common law" under Bankruptcy Code § 101(45).  In Gray, in the context of a preference action, the court determined that a first cousin once removed is within three degrees of consanguinity to the debtor, and thus a relative under § 101(45), an insider pursuant to § 101(31)(A), and therefore subject to the one year look back period under § 547(b)(4)(B).  In reaching its determination, the court in Gray looked toward Missouri law and explained that Missouri uses two methods of reckoning degrees of consanguinity — canon law and civil law:

> Under the canon law the number of generations is counted from the common ancestor down to the farthest of the two descendants whose degree of relationship is to be ascertained. Under the civil law the count ascends by generations from either of the two relatives to the common ancestor and thence down the collateral line to the other.

Gray, at 779 (citing State v. Thomas, 351 Mo. 804, 174 S.W.2d 337, 340 (1943)).[3]  The Gray court's decision to use canon law or civil law was outcome determinative — if debtor's first cousin once removed would be considered a relative, then he would be subject to a preference attack for transfers made more than 90 days pre-petition under § 547(b)(4)(B).  In determining which law to apply, the court reviewed Missouri intestate distribution and juror disqualification laws.  Although the Gray court noted that Missouri had two conflicting approaches to count degrees of consanguinity, it stated "the question is, which of the two approaches better conforms with the purpose of § 547, which is to equalize the distribution scheme among similarly situated creditors."  In re Gray, at 781 (citing In re Libby Intern., Inc., 247 B.R. 463, 470 (8th Cir. BAP 2000)).  After noting that preference laws should be expansively construed, the Gray court ultimately decided to apply the canon law which rendered the related transferee an insider.

Further, in reaching its decision to use the canon law, the Gray court disagreed with another Missouri bankruptcy court that had applied the civil law to count degrees of consanguinity in the context of a preference action to determine that a first cousin of an equity holder of the debtor was not an insider and not subject to § 547(b)(4)(B).  Dewoskin v. Brady (In re Hydraulic Indus. Prods. Co.), 101 B.R. 107, 109 (Bankr. E.D. Mo. 1989) ("First cousins are not within the third degree and are not within the definition of 'relative' in the Bankruptcy law").  In Dewoskin, the court stated "It is not inconsistent with the scheme of the Bankruptcy Code to determine that 'common law' refers to the body of applicable state law in effect at the time of the action which is the subject of [the] proceeding."  101 B.R. at 108.  Although Gray and Dewoskin came to different conclusions

---

[3] At the time State v. Thomas was decided, Missouri had two juror qualification statutes, one for civil and one for criminal proceedings.  The Supreme Court of Missouri in State v. Thomas determined that under the criminal statute, the degrees of consanguinity should be reckoned under civil law and under the civil law statute degrees of consanguinity should be reckoned under canon law.  See Sommers v. Wood, 895 S.W.2d 622, 623 (Mo. Ct. App. 1995).

on whether to use the canon law or the civil law to compute degrees of consanguinity, both cases looked to Missouri law, the state in which the case was pending. See also Mo. Ann. Stat. § 474.010(d) (West) (relatives who are neither ancestors nor descendants of the decedent, may not inherit unless they are related to the decedent at least as closely as the ninth degree, the degree of kinship being computed according to the rules of the civil law). Missouri has no identified nexus with the Loans or Properties at issue here, nor does Noteholder assert that Missouri law governs the issue before this Court.

This Court views this as a matter of statutory construction, without resort to policy implications, and starts with the pronouncement of the United States Supreme Court that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938). Thus, this Court looks to New York state law as the source of the common law to be applied in strictly applying Bankruptcy Code § 101(45). Neither side here cited Judge Grossman's decision in In re Gamaldi, 2009 WL 961417 (Bankr. E.D.N.Y. 2009), which strictly applied the insider definition of § 101(31)(B)(vi) to an estranged step relationship ("The last legal issue for the Court to decide is whether at the time of the $90,000.00 Transfer Rita Gamaldi was an insider of Susanna Gamaldi. Rita Gamaldi asserts that she was not an insider at the time of the $90,000 Transfer because Susanna Gamaldi and George Gamaldi were estranged at that time, although they were still husband and wife…. As of the date of the $90,000 Transfer, Rita Gamaldi was still the stepmother-in-law of Susanna Gamaldi, despite the strained relationship between the Debtors. Therefore, Rita Gamaldi was a relative by affinity of Susanna Gamaldi due to the marriage between Susanna and George Gamaldi."). See also Stevenson v. Sensing (In re Herbison), 1998 WL 35324197 (Bankr. W.D. Tenn. March 24, 1998) (applying the common law of the state in which

the bankruptcy case was pending to determine how to count degrees of consanguinity in a preference action).

Noteholder has not asserted that New York law counts degrees of consanguinity using the canon law. LHM asserts that New York applies the civil law method of computation of degrees of consanguinity, which "is to count from one person up to the common ancestor and down to the other[; o]f course the person from whom the count begins is not counted and he in whom it ends is," citing Woodbury v. Schroeder, 116 Misc. 673, 676 (N.Y. Mun. Ct. 1921) (internal citations omitted), under which "first cousins are relatives to the fourth degree of consanguinity." See also In re Estate of von Knapitsch, 296 A.D.2d 144, 148 (App. Div. 2002) ("such persons are related to the decedent in the fourth degree of consanguinity [i.e. first cousins] . . . .").

Noteholder essentially argues that the Court should not look to the cases cited by LHM for guidance because those cases address consanguinity in the context of distribution of estates in New York. However, the relevant New York statutes and case law this Court has reviewed supports the conclusion that New York law applies civil law to compute degrees of consanguinity. See, e.g. N.Y. C.P.L.R. 4110 (McKinney 2016), (any relative within six degrees of consanguinity or affinity to a party is automatically disqualified from jury service); see Blaine v. Int'l Bus. Machines Corp., 91 A.D.3d 1175, 1176 (N.Y. App. Div. 2012) ("[W]e acknowledge that some jurors or parties may not know all of their distant relatives within the sixth degree of consanguinity or affinity—such as their great-great-grand-nephews."); N.Y. Crim. Proc. Law § 270.20 (McKinney 2016) (a party may object to a prospective juror on the ground that the juror is "related within the sixth degree by consanguinity or affinity to the defendant."); People v. Clark, 16 N.Y.S. 473, 474 (Gen. Term 1891) (interpreting predecessor Code of Criminal Procedure § 377 promulgated by the New York State Legislature in 1881, stated "[t]he mode of computation of degrees used by the civilians, not

by the canonists, is to count from one person up to the common ancestor and down to the other."); N.Y. Comp. Codes R. & Regs. tit. 18, § 415.1(h)(1)(iii) (New York Regulations of the Department of Social Services, governing the authorization and payment of publicly funded child care services, defines "relatives within the third degree of consanguinity of the parent(s) or step-parent(s) of the child include: the grandparents of the child; … and the first cousins of the child, including the spouses of the first cousins."; thus under § 415.1(h)(1)(iii) when one counts degrees of consanguinity starting from the child, a first cousin of the child would be related to the child within the fourth degree); N.Y. Judiciary Law § 14 (McKinney) ("[a] judge shall not sit as such in, or take any part in the decision of, an action … if he is related by consanguinity or affinity to any party to the controversy within the sixth degree.  The degree shall be ascertained by ascending from the judge to the common ancestor, descending to the party, counting a degree for each person in both lines, including the judge and party, and excluding the common ancestor.").

From this Court's review of various methods of counting consanguinity under New York civil law, the outcome is the same here as each method both counts steps that ascend and descend the familial line.  Thus, under New York law, first cousins are further removed than the third degree of consanguinity. Therefore, the Investors Pilevsky are not insiders of Lawyer Pilevsky or of LHM, and LHM is disinterested under Bankruptcy Code § 101(14)(A).

### *Adverse Interest*

Noteholder also contends that LHM is not disinterested under Bankruptcy Code § 101(14)(C) because Investors Pilevsky and Lawyer Pilevsky's familial relationship render LHM as holding or representing an adverse interest.  However, Lawyer Pilevsky and LHM do not hold or represent an interest adverse to the bankruptcy estates or creditors.  Noteholder incorrectly conflates the fact of the familial relationship with holding an adverse interest.  LHM does not

represent Investors Pilevsky in this or any other matter disclosed to this Court; while LHM does represent another entity in a case in the Southern District of New York bankruptcy court in which Investors Pilevsky are also equity owners, they do not represent the equity holders in that case. Based on disclosures made to the Court, Lawyer Pilevsky does not himself hold or own any equity interest in any of these Debtors.  Lawyer Pilevsky did not disclose any prepetition representation by him or LHM of the equity holders in the prepetition formation of these Debtors or in the acquisition of the Properties, therefore the Court determines Lawyer Pilevsky and LHM did not do so.  While LHM must take instructions on behalf of Debtors from someone, and while Lawyer Pilevsky has been the primary attorney for Debtors in these cases, the fact that the person giving LHM instructions may also be an equity owner who is also a first cousin to Lawyer Pilevsky does not in and of itself create an adverse interest, and no other basis for an adverse interest has been demonstrated.

Thus, LHM is disinterested and does not hold or represent an interest adverse to the bankruptcy estates.

Therefore, it is hereby

**ORDERED**, that the Employment Application is approved; and, it is further

**ORDERED**, that ten (10) business days prior to any increases in LHM's rates for any individual employed by LHM and retained by Debtors pursuant to Court Order, LHM shall file a supplemental affidavit with this Court setting forth the basis for the requested rate increase pursuant to Bankruptcy Code § 330(a)(3)(F); parties in interest, including the UST, retain all rights to object to or otherwise respond to any rate increase on any and all grounds, including, but not limited to, the reasonableness standard under Bankruptcy Code § 330; supplemental affidavits are

not required for rate increases effective on or after the date Debtors submit Debtors' Final Report to the UST; and, it is further

**ORDERED**, that no compensation or reimbursement of expenses shall be paid to LHM for professional services rendered to Debtors, except upon proper application and by further order of this Court following a hearing on notice pursuant to Bankruptcy Code §§ 330 and 331, the Bankruptcy Rules, and the Local Rules.



**Dated: January 9, 2017**
        **Central Islip, New York**

                                    **Alan S. Trust**
                        **United States Bankruptcy Judge**